[No. A025298. First Dist., Div. One. Oct. 30, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
FLOYD EMSLEY WILLIAMSON, Defendant and Appellant.

COUNSEL

Jack Burnham for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**ELKINGTON, J.**—Defendant Floyd Emsley Williamson was convicted, on a jury's verdicts, of two counts of rape in violation of Penal Code section 261, subdivision (2), and one count of oral copulation in violation of Penal Code section 288a, subdivision (c). The alleged victim was one Kim, 17 years of age.

Williamson's appeal is from the judgment which was entered upon the jury's verdicts.

He contends only that there was no *"substantial evidence"* supportive of the jury's verdicts.

■ The rules by which we are bound upon such a contention were recently reiterated by the state's high court in *People* v. *Fosselman* (1983) 33 Cal.3d 572, 578 [189 Cal.Rptr. 855, 659 P.2d 1144], as follows: " 'When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.' . . . In applying this test, we must 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' "

Initially we note that it appears, with one possible exception, that Williamson's convictions depended *entirely* upon the credibility of Kim, the complaining witness.

We have read, and reviewed the whole record of Williamson's trial. It fairly portrays the following factual context.

■ Defendant Williamson, generally described by the parties as Bud (a term which we also will hereafter use), had lived with Kim and her mother for about two and one-half years. He was engaged to marry Kim's mother, and a father-daughter relationship existed between him and Kim. Kim conceded that he had always treated her "as a daughter." They were apparently affectionate, for they often "hugged" each other. Bud was steadily employed, and he had apparently been screened for a criminal record and appointed a special county deputy sheriff. But for some reason not apparent from the record, Bud's and Kim's mother's engagement to marry was called off, and he moved into a trailer on the property, located about 50 yards from its residential building. The parting was friendly as to the parties, including Kim; Bud had a key to, and looked after, the house when the women were away. Kim's mother often invited him to dinner, and she continued, as before, to do his laundry. It must reasonably be said that Bud appeared to remain a sort of father figure to Kim.

There came a time when Kim's mother was away, and Kim and a girlfriend were alone one evening in the house. An anonymous person telephoned an obscene message to the girls threatening sexual violence to them (the telephone was listed in Kim's name). His voice was unrecognized. The

frightened girls called Bud who was in his trailer a short distance away. He told them he would leave the trailer's windows opened, and await their "screams" if the threats were implemented in any way. The trailer had no telephone. Soon the obscene message was repeated, the girls screamed for Bud, and he appeared in a "couple of seconds" with a firearm that he was authorized to carry as a deputy sheriff. He sat up in a chair for the entire night protecting the girls while they slept, against an intruder who never appeared.

Kim, then, as noted, 17 years of age, had a boyfriend, Jimmy. In the autumn of 1982, Jimmy made a sexually derogatory remark about Kim's mother, and Bud threatened to "whip Jimmy's butt." And Kim had been disciplined by her mother and Bud for some real, or imagined, infraction. For these, and perhaps other, reasons Kim was angry, and her relationship with Jimmy was broken up. Kim spoke to a friend of "hating" Bud, and around that time expressed an opinion that it was Bud himself who had made the above-described earlier obscene and threatening telephone calls.

A party had been planned for Halloween of 1982 by Kim and a group of friends at the home of one of them. Kim was upset about her breakup with Jimmy and told him that she "didn't want him at the jamboree." She didn't "remember" whether he was "very angry," or whether he "climbed in his car and burned rubber off and took off out of the parking lot."

Friends of Kim testified that at the Halloween party Kim "drank a great deal"; "she was upset [because] she had just broken up with Jimmy." "She was drinking very heavily," and "at some point some people took her into the bedroom, one on each arm," "basically carrying her [and] set her down on the bed." Another witness said, "she appeared to be drunk" and when the party was over, and Kim's car was outside, she "did not think Kim was capable of driving home and I asked her to let someone else . . . drive the car home that night." A young man at the party thereafter did so.

Upon Kim's arrival home her mother was not there, and she went to bed. Then, according to Kim, within a relatively short time she observed a man sitting upon, or lying alongside her on, the bed. At the point of a gun he removed, or forced her to remove, her panties and nightgown and then removed his own clothing. He then insisted that Kim submit to his sexual advances which, from fear, she did. He thereupon raped her twice, and perpetrated an act of oral copulation upon her.

At some point, possibly in response to a question, the man said that he had entered the house through its kitchen window. Upon completion of the criminal sexual acts, he was heard to close the kitchen window, and leave

the premises through its front door. Kim lay on her bed for five, or six, or seven, minutes after the man departed. Then she went to the telephone and called friends, telling them about the incident. To some she said that Bud had raped her; to others she said that she *"thought"* it was Bud who had raped her.

Someone called the police and soon officers and police vehicles arrived at the scene. Kim told them that Bud, who lived in the trailer a short distance away, had raped her. Officers went to the trailer and arrested him. He was thereafter, as noted, charged with, and tried and convicted by a jury's verdicts of, two counts of rape (Pen. Code, § 261, subd. (2)), and one count of oral copulation (Pen. Code, § 288a, subd. (c)), each of which offenses was accomplished by means of force and threats.

We relate other evidence adduced at the trial.

Bud testified that at the time of the charged sexual offenses, he was celebrating Halloween successively at two bars with a lady friend. That testimony was corroborated by his lady friend and two other witnesses.

Upon arrival of police officers at Kim's home soon after the charged criminal incidents had occurred, she told an officer what had happened, after which he made a written report. The report stated that, according to Kim—"the suspect then penetrated her vagina with his penis and ejaculated. . . . The victim stated that the suspect had sex with her at least twice . . ., completing the act both times with ejaculation." (Kim had been asked at the trial: "Do you know what ejaculation is?" She answered: "Yes.")

Soon after their arrival at Kim's home, police officers took her to a hospital for an examination. They there furnished doctors with a "rape kit" previously prepared by law enforcement authorities at Sacramento. The rape kit contained swabs, slides, and other medical accessories, and instructions for examination of sexual assault victims for evidence of the crime. Kim's examination was negative; there was no evidence of spermatozoa, or seminal fluid, or of any *"ejaculations."* Nor was there evidence of trauma, or bruises, or violence, as usually attends such crimes as were here charged. And the coverings, and sheets, and pillow cases of Kim's bed lacked evidence of spermatozoa or seminal fluid. At the trial Kim testified that she did not know, or remember, whether her assailant had ejaculated.

The trial's evidence indicated that the shades of Kim's bedroom windows were drawn, and that when so drawn in the nighttime, the room was "totally" dark. Kim testified variously, (1) that she couldn't see her assailant's face, or recognize his voice, (2) she kept her eyes closed most of the time

and when she occasionally opened them she couldn't see because "it was too dark," (3) she was able to see his "profile from the waist up," (4) she couldn't see his body; "it just felt like [Bud]," Bud's body "feels different," (5) she never saw "any portion of the outline of [the man's] face," (6) she never saw "this person who was doing this act," and (7) he had the odor of beer and cigarettes on his breath, as Bud sometimes did.

The investigating police officers of the case did *not* examine the area of the home's kitchen window, entered by the intruder and then later closed by him, for fingerprints, nor did they examine the dampened ground outside it for footprints matching those of Bud. And it will be remembered that Bud concededly had keys to the house, rendering it unlikely that it was he who had entered it through the kitchen window.

Kim told the officers that Bud had *twice* orally copulated her. At the trial she testified that he had *once* done so.

We consider now, the above-noted exception. An officer testified that when Bud was told he was under arrest for rape, he responded: "Was Kim raped?" And, the officer said that Bud had not previously been told who the rape victim was. But the evidence is clear that just a few minutes before, there had been intense police, and police automobile, activity at Kim's home 50 yards away.

Having considered the whole record before us, and, as required by *People v. Fosselman, supra,* 33 Cal.3d 572, 578, presuming in support of the jury's verdicts, "the existence of every fact that the trier could *reasonably* deduce from the evidence, we find the evidence to be such that *no* rational trier of fact could have found Bud guilty *beyond a reasonable doubt.* The judgment must accordingly be reversed.

The judgment is reversed.

Racanelli, P. J., and Holmdahl, J., concurred.